**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JOHN YANCEY SCHMITT,

     Petitioner,

v.                                Civil Action No. 3:02cv953

WILLIAM PAGE TRUE, Warden,
Sussex I State Prison,

     Respondent.

**MEMORANDUM OPINION**

Pursuant to 28 U.S.C. § 2254, John Yancey Schmitt, a Virginia state prisoner who has been sentenced to death, filed a petition for a writ of habeas corpus challenging his conviction in the Circuit Court for the County of Chesterfield for capital murder and the ensuing death sentence.  In a Memorandum Opinion (Docket No. 80) issued on January 21, 2005, all of Schmitt's claims for habeas relief were rejected except for the following claims:

XIV.      Trial counsel was ineffective when he failed to object in a timely manner to the admission of the tape recording of a jailhouse telephone call between Schmitt and Clifford Sauer.

XV.      Defense counsel was ineffective when he failed to move for a mistrial based on prosecutorial misconduct at the proper time.

XVI.     Defense counsel's performance was prejudicial.

XX.      The admission of the taped jailhouse phone call between Schmitt and Sauer, acting as a government agent, during the  penalty phase violated Schmitt's Fifth and Sixth Amendment rights.

XXI.     Prosecutorial misconduct during the penalty summation deprived Schmitt of due process and a fair trial and the trial court erred when denying curative instructions and a mistrial.

Nor has the Court ruled on Schmitt's March 3, 2004 motion to amend his petition to include the following Claim:

XXIV.     The prosecutor withheld impeachment materials in violation of <u>Brady v. Maryland</u>, and Schmitt's rights to due process of law under the Fifth and Fourteenth Amendments.

In one way or another and to varying degrees, the resolution of Claims XIV and XX affect the resolution of Claims XV, XVI, XXI as well as the proffered amendment.  After discovery, an evidentiary hearing was held on Claims XIV and XX.  For the reasons stated below, Schmitt is not entitled to relief on Claims XIV and XX and the motion to amend to add Claim XXIV is denied.[1]

## I.   THE APPLICABLE SUBSTANTIVE AND PROCEDURAL CONSTRAINTS UPON FEDERAL HABEAS CORPUS REVIEW

This Court's warrant to grant relief by way of a writ of habeas corpus is circumscribed by 28 U.S.C. §§ 2254(d) and 2254(e)(1).  Under Section 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  Schmitt bears "the burden of rebutting the presumption of correctness by clear and convincing evidence."  <u>Id</u>.  Under 28 U.S.C. § 2254(d), a federal court may not grant a writ of habeas corpus based on any claim that was

---

[1] Claims XV, XVI, and XXI are dismissed by a separate Memorandum Opinion and Order also entered this day.

adjudicated on the merits in state court unless the adjudicated claim:

> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The Supreme Court has emphasized that this standard places an additional hurdle before federal habeas petitioners who now must demonstrate not only that the state court's decision was erroneous or incorrect, but also that it was unreasonable. See Williams v. Taylor, 529 U.S. 362, 412-13 (2000).

Claims for federal habeas relief that have not been adjudicated in the state courts do not fall within the compass of 28 U.S.C. § 2254(d) and are not subject to the restrictions of that statute. See Monroe v. Angelone, 323 F.3d 286, 297-98 (4th Cir. 2003). Schmitt suggests that 28 U.S.C. § 2254(d) does not apply to Claim XIV because the claim "was not fully developed in state court." Schmitt's Reply to Mot. for Summ. J. at 4 (citing Williams v. Taylor, 529 U.S. 420, 442-43 (2003)). Neither the decision in Williams nor the language of Section 2254(d) indicate that the strictures of the statute are inapplicable simply because the record was not fully developed in state court. Quite to the contrary, where the claim has been adjudicated on the merits by the

3

state courts, the restrictions of 28 U.S.C. § 2254(d)(1) continue to apply even when a federal habeas court conducts a full evidentiary hearing on the claim. See Reid v. True, 349 F.3d 788, 799 (4th Cir.), cert. denied, 124 S. Ct. 979 (2003); Cf. Bell v. Jarvis, 236 F.3d 149, 160 (4th Cir. 2000) (en banc) (overruling the holding of Cardwell v. Greene, 152 F.3d 331 (4th Cir. 1998) that the level of review turns on the depth of the state court's analysis). Accordingly, the additional evidence that the parties have submitted is relevant to the reasonableness of the state court's adjudication, but it does not alter the standard of federal review. See Mathney v. Anderson, 377 F.3d 740, 747 (7th Cir. 2004), cert. denied, 125 S. Ct. 2252 (2005); Valdez v. Cockrell, 274 F.3d 941, 954 (5th Cir. 2001).

The Supreme Court has explained that "[a] state court's decision is 'contrary to' our clearly established law if it 'applies a rule that contradicts the governing law set forth in our cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.'" Mitchell v. Esparza, 540 U.S. 12, 15-16 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-406 (2000)). The Supreme Court also has made clear that a federal habeas court "may grant relief under the 'unreasonable application' clause [of Section 2254(d)] if the state court correctly identifies the governing legal principle from our

decisions but unreasonably applies it to the facts of the particular case." Bell v. Cone, 535 U.S. 685, 694 (2002). Furthermore, the jurisprudence of the Supreme Court of the United States is the sole source for judging the reasonableness of a particular decision. See Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000) (en banc). With these parameters in mind, Schmitt's claims will be examined.

## II.  FINDINGS OF FACT FOR CLAIMS XIV AND XX[2]

1.  On January 19, 1999, Schmitt and an associate, while armed with a shotgun, robbed the NationsBank in BonAir, Virginia (hereinafter "the Bank").

2.  Clifford Sauer, a roofer, previously had employed Schmitt and they had become social friends as well. EH at 14-15. After the January 19, 1999 bank robbery, Schmitt contacted Sauer for his assistance in purchasing a car. EH at 18-19. Sauer brokered the deal for the car and received a fee from Schmitt for his assistance. EH at 51-52. At the time of the transaction, Sauer did not know that Schmitt had robbed a bank. EH 51-52.

3.  However, later Sauer became suspicious of Schmitt's spending habits. JA at 1344. After some prodding, Schmitt told Sauer that he had robbed a bank. JA at 1344. Schmitt tried to purchase a gun from Sauer. JA at 1345. Sauer refused. JA at 1346. Schmitt asked Sauer if he wanted to drive for another bank robbery. JA at 1345. Sauer declined. JA at 1345. Schmitt told Sauer that if, "you breathe one word of this to anyone . . .

---

[2] The following abbreviations will be used in this opinion:
JA    Joint Appendix from the state direct appeal
EH    Transcript from the evidentiary hearing
Resp.'s Ex.   Respondent's exhibit from the evidentiary hearing
Pet.'s Ex.    Petitioner's exhibit from the evidentiary hearing

I'm going to have to kill you or my friends will have to kill you."  Resp. Ex. 4 at 28.

4.   On January 30, 1999, Schmitt was arrested for obstruction of justice. JA at 1234. Schmitt told the police that his name was James Comer.  JA at 1234. A few hours later, Sauer received a telephone call from an employee of the Henrico County Jail.  JA at 1347.  The employee asked Sauer whether he knew James Comer.  JA at 1347.  Sauer responded in the affirmative.  JA at 1347.  The next voice Sauer heard was that of Schmitt, who told Sauer to contact Kenny Lockner, collect some money, and take it to the Henrico County Jail to bail out James Comer.  JA at 1347.  After the bail was provided, Schmitt was released from custody.  Sauer did not realize that he was actually posting bail for Schmitt instead of Comer until he saw Schmitt walk out of the jail after the bail had been paid.

5.   On Friday, February 5, 1999, several officers, including Detective William George, arrived at Sauer's residence in the City of Richmond.  While George and another officer went to the front door, other officers surrounded the house. EH at 99, 134.  George told Sauer that they were looking for Schmitt in connection with a bank robbery. EH at 18, 100.  Sauer gave the officers permission to search his home and readily answered their questions.  EH at 17, 48-49.  The search lasted only about fifteen minutes. EH at 101, 129.  Before leaving, George left Sauer with his card and requested permission to interview Sauer at a later date. EH at 101-102.  At the time of the search, Sauer was neither threatened nor coerced. Nevertheless, Sauer was apprehensive about the repercussions of having brokered the sale of the car which Schmitt had purchased from money from the first bank robbery.  EH at 18-20.

6.   Sauer did not act with any criminally culpable intent in his prior dealings with Schmitt.  EH Sauer Testimony. Neither the Chesterfield Police nor the Chesterfield Commonwealth's Attorney's office ever contemplated charging Sauer with a crime for his prior dealings with Schmitt.

7.   On February 7, 1999, George and Detective Easton conducted an hour long interview with Sauer in Sauer's home.  EH at 103.  A large portion of the interview was taped and transcribed.  EH at 103; Resp. Ex. 3.  From the

outset of the meeting, Sauer determined to cooperate fully and voluntarily. Resp. Ex. 3 at 9. Sauer's cooperation was not attributable to any threats or intimidation by the police. George and Easton expressly assured Sauer that he was not a target of the police investigation. EH at 103, Resp. Ex. 3 at 9. Sauer volunteered information regarding: Schmitt's purchase of the car; Schmitt's efforts to recruit Sauer as a driver; Schmitt's attempt to purchase Sauer's gun; Schmitt's plans to kill Joanna Murphy, one of Schmitt's friends; and individuals who might lead the police to Schmitt. Resp. Ex. 3. at 9-21.

8.   Between February 7 and February 17, 1999, George and Sauer were in almost daily contact by telephone. EH at 25, 108.

9.   After the January robbery, the Bank hired a security guard, Shelton Dunning. On February 17, 1999, Schmitt walked into the Bank armed with a concealed 45 caliber pistol. Thereafter, Dunning came inside the Bank and stood near the end of the teller line, Schmitt left his place in that line and walked directly to the location where Dunning was standing. Without saying anything, Schmitt fired two shots, one of which hit Dunning in the chest. After the shooting, Schmitt shouted, "get down," and threatened to "kill everybody" if he did not get some money. Schmitt took the money from the tellers and fled the bank. Dunning died shortly after the shooting. The bank surveillance cameras recorded Schmitt robbing the bank, but did not capture the actual shooting. JA Vol. II and III.

10.  Shortly after the murder, Sauer paged George. EH at 141. Sauer told George that he had seen the news of the murder and that he believed that Schmitt was the perpetrator. EH at 141. George went to Sauer's house to seek Sauer's assistance in locating Schmitt. Sauer provided the police with information that led to Schmitt's girlfriend and eventually led to locating Schmitt in Williamsburg on February 20, 1999. EH at 39.

11.  On February 20, 1999, the police surrounded Schmitt in his hotel room in Williamsburg. Diane Clarcq, a crisis negotiator with the Williamsburg police, attempted to persuade Schmitt to surrender peaceably. During the course of their discussions, Schmitt told Clarcq that he had struggled with the security guard and had not

7

intended to kill him. Schmitt eventually surrendered peaceably. JA at 1405-15.

12.    Shortly after the arrest, Craig Cooley and Chris Collins were appointed to represent Schmitt on the February 19, 1999 bank robbery and capital murder of Dunning. Both Cooley and Collins are experienced, highly regarded, and very capable capital defense counsel.

13.    After Schmitt's arrest, Sauer continued to call George on a regular basis. EH at 140-43. The topics of conversations ranged from the preparation of the Schmitt case for trial to Sauer's personal life. From these conversations, Sauer formed the opinion that the police knew most of the relevant facts pertaining to the robberies except where Schmitt had obtained the handgun used in the murder of Mr. Dunning. EH at 152.

14.    Sometime shortly before March 12, 1999, Sauer called George. During that conversation, George asked Sauer whether he had heard from Schmitt. EH at 28-29. Sauer told George that Schmitt had been calling him from jail. EH at 28-30. George asked Sauer to tape any future telephone calls from Schmitt. Sauer agreed to do as George requested. EH at 29, 41, 68.

15.    Immediately after the telephone call with Sauer, George talked with Chief Deputy Commonwealth Attorney, Warren Von Schuch. EH at 110. Von Schuch told George that Sauer could record the calls and instructed George that Sauer could not ask questions. EH at 111, 256. Von Schuch instructed George to provide Sauer with a tape recorder for Sauer's phone. EH at 256.

16.    Later that day, George delivered the recording device to Sauer and explained how to use it. EH at 29. Sauer was eager to assist George in obtaining information from Schmitt. EH at 111-12, 151. George told Sauer that the prosecution was interested in obtaining incriminating information from Schmitt about the robbery. EH at 30, 35, 40; Pet.'s Ex.3 ¶ 8. Sauer asked George what questions the police wanted answered. EH at 151. George responded that the only question left unanswered was the origin of the handgun used in the second robbery. EH at 150-51. Thereafter, George told Sauer that we cannot tell you to ask questions and to basically let Schmitt do the talking. EH at 30, 112. Sauer replied that, "I know what to ask. I watch Court TV." EH at 112. George knew

that Sauer intended to take affirmative steps to secure incriminating information from Schmitt. In fact, there was no other reason for George to have asked Sauer to record conversations with Schmitt or to have supplied a tape recorder to Sauer.

17. George and Sauer provided different versions of Sauer's enlistment. The Court credits, to the extent recited above, Sauer's account of those events and does not believe George's divergent version of the same events.

18. On March 12, 1999, Schmitt called Sauer from jail. During their conversation, Sauer elicited from Schmitt information about the gun, the robbery, and the killing of Mr. Dunning. See e.g., JA 1371-72, 1374-86.

19. George retrieved the tape from Sauer and turned it over to Von Schuch.

20. On March 25, 1999, Sauer testified about his dealings with Schmitt before the multijurisdictional grand jury for the City of Richmond, County of Chesterfield, County of Henrico, and County of Hanover. Pet.'s Ex. 4. Sauer received use immunity for his testimony. Von Schuch was present at the grand jury proceeding and was aware that Sauer had received immunity. EH at 288. Schmitt was indicted for capital murder by a Chesterfield County grand jury, not by the mulit-jurisdictional grand jury.

21. At the end of July 1999, the Circuit Court for the County of Chesterfield granted the defense counsel's motion for discovery and directed the Commonwealth to turn over to the defense any material under Brady v. Maryland, 373 U.S. 83 (1963). Pet.'s Ex. 18, 21; EH at 175, 270.

22. On August 13, 1999, Von Schuch disclosed to defense counsel Schmitt's statements to Lieutenant Clarcq, which included copies of Clarcq's notes. EH 177.

23. Schmitt's trial originally was scheduled to start on October 22, 1999. On September 30, 1999, the Circuit Court granted Schmitt's motion and continued the trial until February 11, 2000. JA 309-18.

24. Throughout the fall of 1999, Sauer continued to contact George to discuss his personal difficulties and his anxiety about testifying at the Schmitt trial. EH at 72-73, 81-82, 142-43. As a result of these conversations,

George became concerned that Sauer might harm himself and might become an unstable witness.  EH at 144.

25.   For those reasons, George contacted the Chesterfield County Community Services Board ("CSB") to obtain mental health services for Sauer.  EH at 115.  George initiated this action out of his concern for Sauer and because he wished to preserve Sauer as an effective witness for Schmitt's trial. EH at 116, 160.  Because Sauer was not a resident of Chesterfield County, George had to "jump through some hoops" to secure CSB services for Sauer.  EH at 116.  The CSB agreed to provide free services to Sauer as a favor to the police department.  EH at 223-24.

26.   On November 12, 1999, George accompanied Sauer to the initial interview at CSB with Dr. Sproul.  EH at 214. Sauer told Dr. Sproul that he was stressed about his relationship with his girlfriend and was afraid of being called as a witness at Schmitt's trial.  EH at 231-33. Nevertheless, Sauer was ambivalent about receiving any mental health treatment, cancelled his subsequent appointment, and never received any services from CSB. EH at 211, 219-20, 235.

27.   At a discovery conference in late November 1999, Von Schuch informed defense counsel that the prosecution had a tape and a surprise witness. EH at 271-73, 357-59. Von Schuch told defense counsel he would provide them more information "after the holidays." EH at 358.  Von Schuch testified that he delayed turning the tape over because Sauer had expressed concern that he would be in danger from Schmitt's friends if they learned that he had agreed to be a witness for the police.  EH at 274, 295.

28.   Around Christmas of 1999, perhaps as late as January 1, 2000, Von Schuch provided defense counsel with a transcript of the March 12, 1999 Schmitt/Sauer tape-recorded conversation.  EH. at 275.

29.   The Schmitt/Sauer tape provided evidence that would have been beneficial to Schmitt during the guilt phase. Although, in that conversation, Schmitt admits to robbing the bank and shooting Dunning, Schmitt's account of those events indicates that he lacked premeditation and thus was probative of the issue of his guilt of capital murder.  Specifically, Schmitt insisted that his gun discharged accidentally during the course of a struggle with Dunning. JA at 1374-86.

30. However, as to the sentencing phase of a capital murder trial, large portions of the tape provide a very negative picture of Schmitt who used profanity throughout the tape and bragged about why he was not worried about the pending capital murder charge. Schmitt expressed concern for his personal relationships and living conditions, and he also appeared to be oblivious to the harm that he had wrought upon the victims of his crimes. Indeed, when reciting his version of how the shooting occurred, Schmitt chuckles under his breath when he explains how Mr. Dunning's "eyes got real big" when Schmitt pointed the gun at him. JA at 1379. The chuckle does not appear in the transcript, but can be heard on the audio tape.

31. The Commonwealth possessed overwhelming physical and testimonial evidence that Schmitt entered the bank armed with a gun, that he shot Dunning, and that he robbed the tellers at gunpoint. Defense counsel determined that the only defense available to Schmitt was the version of events supplied by Schmitt: that the shooting was not premeditated and that the gun had discharged accidentally during the course of a struggle. EH at 201, 367-68. In addition to the Sauer/Schmitt tape, Schmitt's statements to Clarcq and the forensic evidence tended to supported that defense.

32. Cooley and Collins wanted the Schmitt/Sauer tape introduced during the guilt phase of the trial to support the accidental discharge defense. EH at 190; 364. However, Cooley and Collins were aware that Virginia law on hearsay ordinarily excluded a defendant's own out-of-court statements. EH at 178-79, 357. Cooley and Collins also recognized that, because Schmitt's statements on the tape were largely inculpatory, the Commonwealth would be able to introduce them as admissions against Schmitt's penal interest. EH at 364. Thus, counsel perceived that their best chance for having the tape admitted during the guilt phase was to have the Commonwealth introduce the tape.

33. Before trial, defense counsel could not discover at which phase the prosecution would attempt to introduce the Schmitt/Sauer tape. EH at 291, 329. In anticipation that the Commonwealth would decline to introduce the Schmitt/Sauer tape during the guilt phase, Cooley prepared an argument grounded in Virginia case law to persuade the trial court to introduce the tape at the guilt phase of the trial. EH at 196.

11

34. If they were not able to introduce the tape during the guilt phase, Cooley and Collins did not wish the tape to be admitted during the sentencing phase. Before trial, Cooley and Collins believed that Sauer's conduct in taping his conversation with Schmitt at the behest of the police violated Schmitt's Sixth Amendment right to counsel. EH at 185-86, 201, 366, 371. Cooley and Collins had sufficient information to make a pretrial motion to suppress the Sauer tape on Sixth Amendment grounds. EH at 201, 359-66; JA at 1030-31. Both Cooley and Collins knew that, under Va. Code § 19.2-266.2, motions to suppress on constitutional grounds had to be filed before trial. EH at 186, 386.

35. Collins recognized that, under Virginia procedure, it was conceptually possible to move before trial for a ruling on the defense argument that the tape was admissible during the guilt phase as an admission against Schmitt's penal interest and that, if the motion failed, it was possible simultaneously to pursue a pretrial motion to suppress the motion at the sentencing phase. EH at 383. Counsel declined to pursue any pretrial motion to suppress because of his overriding concern was to have the tape introduced into evidence during the guilt phase and he did not wish to take any action that would discourage the prosecution from introducing the tape during that phase. EH at 364-66, 370, 383. If counsel had possessed the additional information regarding Sauer's contacts with the police that was revealed during the federal habeas proceedings, it would not have changed Collins's decision not to pursue a pretrial motion to suppress. EH at 382.

36. In declining to file a pretrial motion, counsel weighed the aggregate harm and benefit of the tape. See FF 29-31. In this regard, Collins and Cooley did not view the Schmitt/Sauer tape as entirely negative with respect to sentencing. EH at 191, 365, 373. First, counsel believed that, even during sentencing, the tape could foment residual doubt on the issue of premeditation that could be helpful in avoiding a death sentence. EH at 384. Second, the tape could humanize Schmitt in the eyes of the jury because it showed Schmitt demonstrating concern for protecting people he had involved in his crimes. EH at 384. This admittedly weak evidence was considered helpful because there was virtually no other significant mitigating evidence available to the defense. EH at 384.

37.   The prosecution team initially planned to include Schmitt's statements to Sauer as part of the Commonwealth's guilt phase case. EH at 276, 291, 297. Upon further reflection of the benefits of the tape to the defense during the guilt phase, the prosecution decided to wait until the sentencing phase to introduce the tape.  EH at 297.

38.   When the prosecution failed to introduce the tape during the guilt phase, counsel attempted to introduce the tape as part of the Schmitt's guilt phase defense.  JA at 1031.  The trial court sustained the prosecution's objection that the statement was inadmissible hearsay. JA at 1035.

39.   In order to impose the death penalty in Virginia, the jury must "find that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society" (the future dangerousness aggravator) or that the defendant's "conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim" (the vileness aggravator). Va. Code Ann. § 19.2-264.2. At sentencing, the Commonwealth contended that both the vileness predicate and the future dangerousness predicate were present.

40.   When the prosecution sought to introduce the Schmitt/Sauer tape during the sentencing phase, counsel objected that the tape constituted a violation of Schmitt's Fifth and Sixth Amendment rights because, "Sauer is clearly acting at the behest of . . . and as an agent of the police."  JA at 1338.  The prosecution responded that the motion was untimely and also argued that Schmitt's constitutional rights had not been violated.  JA at 1338-39.  The trial court overruled Schmitt's motion without explaining the basis for its ruling.  JA at 1341.  The tape was played to the jury and Sauer testified on behalf of the prosecution.

41.   On February 18, 2000, the jury rejected the prosecutor's assertion of the "vileness" aggravating factor, found the presence of the future dangerousness aggravator, and sentenced Schmitt to death.

42.   Around midnight on February 20, 2000, the Richmond police
      called George for assistance with Sauer who was upset
      about some housing that was proposed for his neighborhood
      and he was hinting that he would hurt himself.   EH at
      122-23.   George took Sauer to the Chesterfield Police
      Department where Jennifer Erisman conducted an emergency
      evaluation and determined that Sauer was not a danger to
      himself or others.   EH 126-27.   Sauer was released.

43.   When Sauer received a reckless driving ticket in 2003, he
      went to Von Schuch for help.   EH at 279.   Von Schuch
      arranged for Sauer to keep his license provided that
      Sauer pay a hefty fine.   EH at 279.

## III. CONCLUSIONS OF LAW

### A.   CLAIM XX IS DEFAULTED

When the Commonwealth sought to introduce the Sauer tape at
sentencing, Schmitt objected that it violated his rights under the
Fifth and Sixth Amendments.   The Commonwealth countered that
Schmitt had waived any such objection because he had failed to file
a timely pretrial motion seeking the exclusion of the evidence as
required by Va. Code § 19.2-266.2.[3]   Additionally, the Commonwealth
asserted that the underlying argument lacked merit.   The trial
court examined the transcript of the Sauer tape and then denied
Schmitt's motion to exclude the evidence, without stating the
reasons for so doing.   On appeal, the Supreme Court of Virginia

---

[3] Va Code § 19.2-266.2 requires that, in the absence of good
cause shown and in the interests of justice, all motions seeking
suppression of evidence based on an alleged violation of the
Fourth, Fifth, or Sixth Amendments, must be made in writing, not
later than seven days before trial.

found that Claim XX was barred under Va. Code § 19.2-266.2. <u>Schmitt v. Commonwealth</u>, 547 S.E.2d 186, 199 (Va. 2001).

Schmitt suggests that Claim XX is not defaulted because the trial court decided this issue on its merits, not because the motion was untimely, as the Supreme Court of Virginia held.  That argument is not without some force because the trial court decided the issue only after examining a transcript of the tape and listening to argument on the merits.  However, the argument ignores the principle that the decision of the Supreme Court of Virginia, if unambiguous, is dispositive of the question whether a claim is procedurally defaulted.  <u>See</u> <u>Skipper v. French</u>, 130 F.3d 603, 611-13 (4th Cir. 1997).  Only if that decision is ambiguous does this Court look to the decision of the trial court.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 806 (1991); <u>Harris v. Reed</u>, 489 U.S. 255, 263 (1989).  Here, the Supreme Court of Virginia unambiguously determined that Claim XX had been defaulted under Va. Code § 19.2-266.2.

Alternatively, Schmitt contends that this is an, "exceptional case in which the exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002).[4]   In

---

[4] In that case, Lee claimed that a Missouri trial court had deprived him of due process by denying an oral motion for an overnight continuance to locate a subpoenaed alibi witnesses who had been present earlier, but who had left the courthouse without explanation during the trial.  Although neither the trial judge nor

Lee, the Supreme Court of the United States held that, under the exceptional circumstances of that case, "the Missouri Rules, as injected into this case by the state appellate court, did not constitute a state ground adequate to bar federal habeas review." Id. at 366.   The Supreme Court found that four special circumstances supported that conclusion: (1) at trial, neither the trial court nor the prosecutor referred to the procedural rules relied on by the state appellate court; (2) there was no indication that formal compliance with the rules would have changed the trial court's decision; (3) no published state decision required precise compliance with the rules in the urgent situation presented in Lee's case; and (4) the purpose of the rules was served by Lee's submissions immediately before and at the short trial.   Id. at 387. Schmitt's reliance on Lee is misplaced.

The combination of special circumstances noted in Lee are not present here.   First, at trial, the prosecutor relied upon Schmitt's failure to comply with Va. Code § 19.2-266.2 as the primary objection to Schmitt's attempt to exclude the tape on constitutional grounds.   Although it is unclear whether compliance with § 19.2-266.2 would have changed the trial court's

---

the prosecutor identified any procedural defect in Lee's continuance motion, the Missouri Court of Appeals held that the denial of the motion was proper because Lee's counsel had not complied with procedural rules specifying the showing required for such a motion and requiring that continuance motions be in writing, accompanied by an affidavit.

determination to allow the Commonwealth to introduce the evidence, the third and fourth special circumstances identified in Lee are clearly absent.  Specifically, well over a year before the Supreme Court of Virginia rendered its decision in Schmitt's case, the Court of Appeals of Virginia had applied the default rule of Va. Code § 19.2-266.2 in Upchurch v. Commonwealth, 521 S.E.2d 290 (Va. App. 1999).  Thus, the third special circumstance noted in Lee, that the rule had not been applied under similar circumstances in a published decision, is not present.  As to the fourth Lee factor, the purpose behind Va. Code § 19.2-266.2 was not satisfied by Schmitt's belated objection.  The Virginia legislature required that such motions be made before trial so that the Commonwealth would have an opportunity to pursue an interlocutory appeal to an adverse ruling.  Id. at 292.  Schmitt's belated objection to the Sauer tape came too late for the Commonwealth to pursue an interlocutory appeal from any adverse ruling.  Accordingly, Claim XX is defaulted and barred from review here absent a showing of cause and prejudice.  Schmitt's assertion of cause is the ineffective assistance of counsel which is the basis for Claim XIV which is considered next.

**B.   CLAIM XIV: THE FAILURE OF COUNSEL TO FILE A PRETRIAL MOTION TO SUPPRESS THE SAUER TAPE**

In Claim XIV, Schmitt faults trial counsel for failing to file a pretrial motion to suppress the Sauer tape as a violation of Schmitt's rights under the Fifth and Sixth Amendments.  Of course,

17

Fifth Amendment concerns against coercive self-incrimination are not implicated when, unprompted by any threat or promise, a defendant provides information to individuals whom the defendant does not believe are connected to law enforcement.  See Arizona v. Fulminante, 499 U.S. 279 (1991); Illinois v. Perkins, 496 U.S. 292, 296-97 (1990).  Accordingly, counsel was not deficient for failing to pursue a challenge to the admission of the tape on Fifth Amendment grounds and that aspect of Claim XIV will be dismissed.

Schmitt's Sixth Amendment challenge to the tape is far more substantial.  To prevail on the Sixth Amendment challenge, Schmitt must demonstrate that: (1) his right to counsel had attached; (2) the informant was acting on behalf of the state; and (3) the informant deliberately elicited incriminating statements from him. Massiah v. United States, 377 U.S. 201, 204-6 (1964).

On habeas review, the Supreme Court of Virginia found that counsel was not deficient and that Schmitt was not prejudiced by the failure to make a timely motion to suppress the Sauer tape. The Supreme Court of Virginia based its ruling on the determination that Schmitt could not satisfy the second and third elements of a Massiah claim.[5]  Schmitt v. Warden, No. 020585, at 11 (Va. Sep. 23, 2002).  Specifically, the Supreme Court of Virginia held that:

---

[5] It is undisputed that Schmitt's right to counsel had attached by the time that the police spoke to Sauer and requested his cooperation in taping any phone calls he received from Schmitt.

> Sauer was not an agent of the Commonwealth. His role was limited to the passive receipt of information from the petitioner.  Sauer did not initiate conversations for the police nor did he receive anything of benefit from the police."

Id.[6]

Schmitt is required to establish that the Supreme Court of Virginia's rejection of Claim XIV constituted an unreasonable application of the progeny of Massiah and Strickland.  See Humphries v. Ozmint, 397 F.3d 206, 228 (4th Cir. 2005)(en banc)(Luttig, J., concurring).  This requires Schmitt to demonstrate all of the following propositions: (1) it was contrary to, or an unreasonable application of, Massiah to conclude that the state did not deliberately elicit information from Schmitt; (2) it was contrary to, or an unreasonable application of, Massiah to conclude that Sauer was not a government agent; (3) the failure of counsel to pursue a pretrial motion to suppress was constitutionally deficient performance;[7] and (4) there is a

---

[6] The Supreme Court of Virginia's factual findings respecting Sauer's passive role and his failure to receive "anything of benefit from the police" are binding on this Court absent clear and convincing evidence to the contrary.  See 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436 459-61 (1986).  However, the Supreme Court of Virginia's conclusion that Sauer was not an agent of the Commonwealth is a mixed finding of fact and law subject to review under the standards 28 U.S.C. § 2254(d).  Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 893 (3d Cir. 1999) (en banc) (reviewing agency determination under 2254(d)); Creel v. Johnson, 162 F.3d 385, 392-93 (5th Cir. 1998) (citing cases).

[7] Because, as explained below, Schmitt cannot demonstrate that the state court's performance determination fails de novo review, the Court declines to address whether that determination is entitled to a more deferential review.  See Moody v. Polk, 408 F.3d

reasonable probability that Schmitt would have been sentenced to life in prison had the tape been excluded.  Id. at 228-29.  As explained below, Schmitt clears the first two hurdles, but not the third and hence the fourth issue--prejudice--will not be addressed.

### 1.  Deliberate Elicitation

To satisfy the so-called "deliberate elicitation" aspect of a Massiah claim, the defendant must "demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).  Even when the state harvests information in a situation that was likely to lead to the defendant making incriminatory statements in the absence of counsel, there is no violation of a defendant's Sixth Amendment rights where the informant did no more than listen.  Id. at 460.  Here, the Supreme Court of Virginia concluded that Sauer's role was limited to the passive receipt of information.  However, the tape of the telephone call provides clear and convincing evidence that Sauer actively was attempting to secure information from Schmitt.

Initially, Sauer allowed Schmitt to control the conversation and simply responded to Schmitt's questions.  However, as encouraged by George, Sauer soon began to steer Schmitt into talking about the bank robbery.

---

141, 147 n.2 (4th Cir. 2005).

> MR. SAUER:      They sure tell a whole different - - that paper and all sure tells a whole different story then what you told on what happened on that second thing, man.

JA at 1362.   Schmitt responds by saying that he really is not worried about the murder charge and then drifts into discussing an old girlfriend and life in the jail.   JA at 1362-72.

Shortly thereafter, Sauer brings Schmitt back to the robbery by discussing the gun that was used.

> MR. SAUER:      I bet you do.  Damn, man.(inaudible).

> MR. SCHMITT:    (Inaudible.)  Wasn't it?

> MR. SAUER:      Colt nine eleven – - nineteen eleven, wasn't it?

> MR. SCHMITT:    It was a copy of it.  Yeah.  I don't know.  I don't - - you know, I can't say nothing.  You know this shit is tapped.  You know what I mean?

> MR. SAUER:      Well, yeah, but - -

> MR. SCHMITT:    You know your shit.  You know what I mean?  It said nineteen eleven on it, you know, but it was a copy, but, yeah (inaudible).

> MR. SAUER:      Not the nine, huh?

> MR. SCHMITT:    No.

> MR. SAUER:      The one I had a long time ago was just a nine rim.

JA at 1371-72.

Subsequently, Sauer sought to probe why Schmitt believed that he would be "all right" on the murder charge.   JA at 1374-75.   As the conversation about the Schmitt's defense drifted off, Sauer

21

sought to return Schmitt to the topic and thereby to obtain further information from Schmitt by challenging Schmitt's version of the robbery.

MR. SAUER:      They had witnesses that were in the bank and all.  I heard in the paper- -

MR. SCHMITT:    Oh, yeah.

MR. SAUER:      And shit that said-

MR. SCHMITT:    Oh, yea.

MR. SAUER:      That that ain't how –

MR. SCHMITT:    I know.

MR. SAUER:      It said that you stood in the line and then just turned-

MR. SCHMITT:    And just blew him away.

MR. SAUER:      And when it was your turn, just pow.

MR. SCHMITT:    Them mother fuckers.  That's how fucked up that - - that's how traumatic it was, and that's how their brains - - you know what's I'm saying?  You know how you can see something, but it really did not happen like that?  You know what I'm saying?

JA at 1376-77.

Thereafter, Schmitt explained his version of the events in the Bank including his pleasure at scaring the security guard, Shelton Dunning.

MR. SCHMITT:    [Mr. Dunning] comes, and he stands right behind me, like he knew.  You know what I'm saying.  And he turns around this big gung-ho Marine.  You know what I'm saying?  Fucking 20-year veteran and all

22

|  |  |  |
|---|---|---|
|  |  | this shit, the first to volunteer for the dangerous mission.  You know what I mean. |
| MR. SAUER: | Right. |  |
| MR. SCHMITT: | . . . . Then [Mr. Dunning] got to like my left shoulder, stood right there. |  |
| MR. SAUER: | Uh-huh. |  |
| MR. SCHMITT: | And I was like, man, what happened (inaudible) you know, and all of a sudden he walked by.  He walked by on me and went over there and stood by the damn tellers.  Right?  When he turned around, I was pointing my gun at him, and his eyes got real big.  Right? |  |

JA at 1378-79.  At this point on the tape, Schmitt is heard to chuckle.

     After Schmitt finished his story, Sauer continued to solicit information about the robbery by asking Schmitt why he did not leave the bank when he saw there was a guard.

| MR. SAUER: | Didn't you see him when you first went in there? |
|---|---|
| MR. SCHMITT: | He come around the corner, man.  He was slipping around the back or something the whole time. |
| MR. SAUER: | And you did not even have the gun out yet; right? |
| MR. SCHMITT: | Hell, no. |
| MR. SAUER: | Man, why in the fuck didn't you just leave? |
| MR. SCHMITT: | I don't know what- - |
| MR. SAUER: | God damn, man. |

> MR. SCHMITT:     I was committed, man, because I was on
> the run.  You know what I mean?  Once I
> get in there, I mean, who knows, man. You
> know?

JA at 1383.  Finally, when Schmitt expressed his belief that he is

going to be acquitted on the capital murder charge, Sauer attempted

to elicit what Schmitt's counsel had told him about the capital

murder charge.

> MR. SCHMITT:     So fuck that murder charge.

> MR. SAUER:       Well, what did you lawyer say about that?

> MR. SCHMITT:     That Chesterfield don't want to let it
> go.  I said, fuck Chesterfield.  You know
> what I mean?

JA at 1386.

During closing argument in the sentencing phase of the trial,

the prosecution relied heavily on the tape to demonstrate that

Schmitt lacked remorse and that his crime warranted a sentence of

death.

> He's not remorseful, and I can tell you
> how you can tell he isn't remorseful.  You can
> tell it by the tape 21 days after he's locked
> up . . . you hear him talk to Duke Sauer.
> That's the real Yancey Schmitt.
>
> * * * *
>
> . . . . We have Yancey Schmitt telling you
> about the killing of Shelton Dunning in his
> own words, in his own element from his heart
> of hearts.  Do you remember when it got to the
> point where he turned the corner, and listen
> to the tape, he laughed.  He got satisfaction.
> He found it humorous that Shelton Dunning's
> eyes got real big with that 45 pointed right
> in his face at an instant before he killed

24

> him, took his life from him.  Ladies and
> gentleman, what I told you earlier about a
> little bit you can see or hear a person in a
> small situation it'll speak volumes about who
> and what they are.  That tells you volumes
> about who and what Yancey Schmitt is.  Do you
> remember when Duke Sauer said why didn't you
> just leave?  Do you remember what the
> defendant said?  I was committed man.  He was
> committed.  That goes to vileness.  That shows
> you what is in his mind.  That shows you what
> he thinks is funny.

JA at 1557-59.  In its rebuttal case, the prosecution relied on the tape to respond to the defense assertion that Schmitt basically was a good person who because of his addiction to drugs had made some bad mistakes.

> But drugs make him different . . . . You had
> occasion to listen to the tape . . . . and you
> would think if he's the type of person
> [defense counsel] says when he's off drugs and
> been at jail for three weeks, he should be
> overwhelmed with remorse for what he has done.
> I mean, wouldn't that be the good Yancey
> Schmitt? We would know then; right?
>       He's on the phone saying I've got the two
> badest lawyers for capital murder in Virginia
> . . . . I'm all right on the murder charge.
> If they can get that damn bank robbery charge
> transferred to the Feds, man, I'll be home in
> 15 or 20 years.  Does that sound like remorse?
> Does that sound like the good Yancey Schmitt.

JA at 1579-80; see JA at 1581.

The taped conversation provides clear and convincing evidence that Sauer's role was not limited merely to the passive receipt of information.  Sauer's numerous questions to Schmitt about the crime fall squarely within the parameters of deliberate elicitation as defined by the Supreme Court.  See Massiah v. United States, 377

25

U.S. 201 (1964); United States v. Henry, 447 U.S. 264, 271-75 (1980) Maine v. Moulton, 474 U.S. 159, 165-66 (1985).  In Massiah, the defendant made the incriminating statements in a conversation with one of his confederates who secretly had agreed to permit Government agents to listen to the conversation over a radio transmitter.  The deliberate elicitation element was satisfied when the confederate followed the law enforcement officer's instructions and engaged Massiah in conversation relating to the alleged crimes.  See Kuhlmann v. Wilson, 477 U.S. 436, 457-59 (1986) (reciting the facts from Massiah v. United States, 377 U.S. 201 (1964) and United States v. Massiah, 307 F.2d 62, 72-73 (1962)) (Hays, J., dissenting in part)).[8]  Similarly, in Moulton, the Supreme Court concluded that the informant, a codefendant, had "deliberately elicited" incriminating statements from the defendant by professing to have a poor memory and asking the defendant to remind him of the circumstances of the crimes and by "reminiscing" about events surrounding the various thefts.  474 U.S. at 165-66.

---

[8] The Supreme Court of Virginia's finding that Schmitt "initiated" the telephone call does not allow Sauer to interrogate Schmitt without any constitutional repercussions.  "[K]nowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity."  Maine v. Moulton, 474 U.S. 159, 176 (1985) (affirming the suppression of taped conversations between the defendant and his former codefendant, who was cooperating with the police); id. at 174 ("[T]he identity of the party who instigated the meeting at which the Government obtained incriminating statements was not decisive or even important to our decisions in Massiah or Henry.").

Moulton and Henry also illustrate that the historical circumstances that led to the incriminating statements are pertinent to evaluating whether the statements are the product of deliberate elicitation. In Henry, the Court concluded that the government was charged with deliberately eliciting testimony when it put a commissioned informant on Henry's scent and the informant then "stimulated conversation" with Henry. Henry, 447 U.S. at 271-75. The Court noted that, even if one credited the government's assertion that it did not intend for the informant to take affirmative steps to secure incriminating information, the government "must have known that such propinquity would lead to that result." Id. at 271. Here, the circumstances leading to the March 12, 1999 taping reflect that George knew that Sauer did not intend to be a passive listener. Rather, Sauer stated that he intended to guide and encourage Schmitt into making incriminating statements. Thus, George, and hence the Commonwealth, knew that Sauer intended to elicit incriminating information from Schmitt. In light of the foregoing facts and law, the Supreme Court of Virginia unreasonably applied then extant Supreme Court jurisprudence when it concluded that Sauer's conduct did not constitute deliberate elicitation.

## 2. The Decision That Sauer Was Not Acting On Behalf Of The Commonwealth

As mentioned previously, the Supreme Court of Virginia also held that:

27

> Sauer was not an agent of the Commonwealth. His role was limited to the passive receipt of information from the petitioner. Sauer did not initiate conversations for the police nor did he receive anything of benefit from the police.

Schmitt v. Warden, No. 02-0585 at 11 (Va. Sup. 23, 2002). For the reasons set forth in the preceding section, two of the three reasons for holding that Schmitt was not an agent of the Commonwealth (that his role was "limited to the passive receipt of information" and that "he did not initiate conversations for the police") do not stand up under either Section 2254(d)(1) or (2). Thus, those findings cannot support a legal conclusion that Sauer was not an agent of the Commonwealth. The only remaining ground given for the decision that "Sauer was not an agent of the Commonwealth" was that Sauer did not "receive anything of benefit from the police."

The record is clear that Sauer did not receive consideration in exchange for taping his conversations with Schmitt. See infra Sec. III.B.2.a. However, for the reasons set forth below, that finding is legally insufficient to foreclose the Massiah claim because the controlling decisions of the Supreme Court do not require receipt of consideration as a prerequisite to finding that an informant was acting on behalf the state. See infra Sec. III.B.2.b. Therefore, a decision made on that basis is an unreasonable application of the controlling decisions of the Supreme Court of the United States.

**a.   Sauer Did Not Receive Consideration in Exchange for Taping and Engaging Schmitt in Conversation on March 12, 1999**

Before addressing the legal issue of whether consideration is a prerequisite to a determination of agency, it is appropriate to assess Schmitt's contention that, as a matter of fact, Sauer actually received a benefit from the Commonwealth in exchange for satisfying the request that he talk with Schmitt, elicit information from Schmitt, and record the conversations.  Although, in Henry, the Supreme Court described the informant as a "paid informant" (because he was), courts have interpreted the consideration element broadly.  See Thomas v. Cox, 708 F.2d 132, 135 (4th Cir. 1983).  As explained by the Third Circuit, "the Court meant that any informant who is offered money, benefits, preferential treatment, or some future consideration, including, but not limited to, a reduction in sentence, in exchange for eliciting information is a paid informant."  See United States v. Brink, 39 F.3d 419, 423 n.5 (3d Cir. 1994).  Of course, when an informant acts on "unencouraged hope to curry favor, . . . he could not properly be characterized as . . . 'a Government agent expressly commissioned to secure evidence.'"  Thomas, 708 F.2d at 136 (quoting United States v. Henry, 447 U.S. 264, 273 (1980)).  That kind of motivation, like conscience and curiosity, are not evidence useful to evaluation of the existence of agency because the animating force for securing information is not attributable to

the government.  Id.; see also United States v. Love, 134 F.3d 595, 604 (4th Cir. 1998).  The foregoing principles inform the assessment of Schmitt's contention that the Commonwealth provided the following as consideration to Sauer in exchange for taping his conversation with Schmitt: (1) Sauer was not charged with any offense in connection with either of Schmitt's robberies even though he could have been charged as an accessory after the fact; (2) Sauer was given immunity when he testified before multi-district grand jury; (3) Sauer was aided by George in obtaining free mental health counseling from the County of Chesterfield before Schmitt's trial although Sauer was not a resident of the County of Chesterfield and thus was not entitled to free treatment; and (4) after the trial, Von Schuch secured favorable treatment for Sauer in resolving a traffic ticket citation.

### (i)   Failure to Pursue Criminal Charges

Schmitt argues that there was an implicit agreement between Sauer and the Commonwealth that, in exchange for Sauer's continued cooperation, Sauer would not be charged as an accessory after the fact to the January 19 bank robbery.  To convict a defendant as an accessory after the fact in Virginia, the Commonwealth must prove that: (1) the felony is completed; (2) the defendant knew that the felon committed the crime; (3) the defendant must "receive, relieve, comfort or assist" the felon.  Manley v. Commonwealth, 283 S.E.2d 207, 208 (Va. 1981).

Under Virginia law, "merely suffering the principal to escape" or failing to report a known felon to the authorities are omissions which are not sufficient to make a party an accessory after the fact. Wren v. Commonwealth, 67 Va. 952 (1875). Rather, "the true test of whether one is an accessory after the fact is to consider whether what he did was done by way of personal help to his principal, with the view to enabling his principal to elude punishment, the kind of help being unimportant." Buck v. Commonwealth, 83 S.E. 390, 393 (Va. 1914). The only active role that Sauer took after he formed the opinion that Schmitt had robbed the bank on January 19 was to respond to Schmitt's request to bail James Comer out of the Henrico Jail. Although Sauer participated in securing Schmitt's release from the Henrico County Jail, the undisputed record reflects that he mistakenly thought he was aiding "James Comer," a friend of Schmitt's. Thus, there is no evidence that Sauer had the requisite mens rea to have been charged, or convicted, as an accessory after the fact to the January bank robbery. Moreover, the record demonstrates that the Commonwealth never contemplated charging Sauer in connection with Schmitt's crimes and communicated that fact to Sauer well before Sauer taped his conversation with Schmitt on March 12, 1999. In sum, there is no evidence that Sauer's cooperation is traceable to any explicit or implicit threat of criminal sanction.

The failure to pursue criminal charges does not qualify as consideration where, as here, there is no evidence that pursuit of such charges were contemplated.  See Creel v. Johnson, 162 F.3d 385, 394-95 (5th Cir. 1998).[9]  Schmitt has failed to produce any evidence that the Commonwealth foreswore criminal charges against Sauer in exchange for Sauer's agreement to tape his conversations with Schmitt.  Viewed most favorably to Schmitt, the record shows that Sauer harbored the belief that cooperating would place him in the good graces of the police and would evince that he had a clean conscience when he dealt with Schmitt after the first robbery. Motivation of that ilk is insufficient to establish consideration. See Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 894-95 (3d Cir. 1999) (en banc); Thomas, 708 F.2d at 136.

---

[9]   Schmitt initially suggested that Sauer could have been prosecuted as an accessory before the fact to the bank robbery in which Mr. Dunning was murdered.  See Smith v. Commonwealth, 531 S.E.2d 608, 610 (Va. App. 2000) (quoting McGhee v. Commonwealth, 270 S.E.2d 729, 732 (Va. 1980)) ("An accessory before the fact is an individual who must 'know or have reason to know of the principal's criminal intention and must intend to encourage, incite, or aid the principal's commission of the crime.'"). However, Schmitt wisely refrained from pressing that charge after discovery.  The expanded record demonstrates that Sauer never intended to encourage or aid Schmitt in the second robbery. Indeed, well before the second robbery, Sauer was voluntarily and actively assisting the police in their efforts to apprehend Schmitt.

**(ii) Benefits Conferred Upon Sauer After the Taping of the March 12, 1999 Telephone Call**

Approximately two weeks after Sauer taped the conversations at issue, he testified before the so-called multijurisdictional grand jury. Sauer was granted use immunity as to the testimony that he gave.

The record shows that the multijurisdictional grand jury was not the one that returned the capital merder indictment. That indictment was returned later by a grand jury convened in Chesterfield County. The purpose for having Sauer (and other witnesses) testify before the multijurisdictional grand jury was to fix their testimony while events were fresh in their minds. Schmitt contends that the grant of use immunity supports a finding that Sauer received consideration in exchange for agreeing to tape his conversations with Schmitt (or, at least, that the grant of immunity was evidence probative of that issue). Schmitt also contends that the offer of free mental health treatment provided to Sauer in November 1999, and a post-trial assist with a traffic citation by Von Schuch demonstrate that Sauer was a government agent.

The relevant inquiry is whether the informant was acting on behalf of the state at the time he elicited the statement. <u>See</u> <u>Thomas</u>, 708 F.2d at 135 n.4 (citing <u>United States v. Malik</u>, 680 F.2d 1162, 1164-65 (7th Cir. 1982)). Thus, the fact that

33

subsequently Sauer was given access to free mental health counseling from the County of Chesterfield, that Sauer was given immunity when he testified before the grand jury on March 25, 1999, and that, after the trial, Von Schuch secured favorable treatment for Sauer in the resolution of a traffic ticket do not constitute consideration with respect to Sauer's conduct at the time of taping the conversation that was admitted into evidence. Id. For the foregoing reasons, it cannot be held that Sauer received consideration (a benefit from the Commonwealth) as part of the agreement between him and the Commonwealth to obtain information from Schmitt. That finding, says the Commonwealth, disposes of Sauer's Massiah claim. As explained below, it does not.

> **b.  Does the Controlling Law Make the Conferring of a Benefit or Consideration an Essential Component of a Massiah Claim?**

The starting point for analyzing this issue is the decision in Massiah. There, the petitioner was free on bail when a federal law enforcement officer "succeeded by surreptitious means in listening to incriminating statements made by him [to the informant]." Massiah v. United States, 377 U.S. 201, 202 (1964). At the time that the communications were intercepted, Massiah had been arraigned and then indicted for possession of narcotics, and counsel had been appointed for him. Not long after Massiah was released on bail, his co-defendant decided to cooperate with the government and permitted a law enforcement officer to install a

radio transmitter in his car.  Later, when the co-defendant and Massiah were discussing the case between themselves, the law enforcement officer listened in at a distance.  The issue framed by the Supreme Court was whether the admission of the statements obtained in that conversation offended Massiah's Sixth Amendment right to counsel.  Using its decision in Spano v. New York, 360 U.S. 315 (1959) as the point of analytical departure, the Court cited with approval, and as reflective of the applicable principles of the Sixth Amendment, a rule that had been followed, as a result of Spano, in the New York courts, to-wit:

> Any secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime.

Massiah, 377 U.S. at 205 (quoting People v. Waterman, 175 N.E.2d 445, 448 (1961)).  According to the Court in Massiah, "this view no more than reflects a constitutional principle established as long ago as Powell v. Alabama," (quoting text articulating the importance of the Sixth Amendment right to counsel as outlined in Powell v. Alabama).  Id.  Having laid that constitutional groundwork, the Supreme Court announced that:

> We hold that the petitioner was denied the basic protections of that guarantee [the Sixth Amendment right to counsel] when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he

35

had been <u>indicted</u> and in the <u>absence of his
counsel</u>.

<u>Massiah</u>, 377 U.S. at 206 (emphasis added).

It is apparent from the text of <u>Massiah</u> that the "federal
agents" referred to in that quotation were federal law enforcement
agents and the inquiry did not focus on whether the co-defendant
who had allowed the placement of the listening device in his
vehicle and who had talked with Massiah was an agent of the United
States.  On the other hand, it is equally clear that a critical
aspect of the decision in <u>Massiah</u> was that the evidence used
against the defendant was information that had been deliberately
elicited by a person who was cooperating with the government.  <u>See
Massiah</u>, 377 U.S. at 210-211  (White, J. dissenting).[10]  Whatever
else may be said of <u>Massiah</u>, the decision does not recite that the
cooperating co-defendant received either consideration or benefit

_____

[10] In the dissent, Justice White made the point that:

> Had there been no prior arrangements between
> Colson and the police, had Colson simply gone
> to the police after the conversation had
> occurred, his testimony relating Massiah's
> statements would be readily admissible at the
> trial as would be a recording that he might
> have made of the conversation. . . . But, if,
> as occurred here, Colson had been cooperating
> with the police prior to his meeting with
> Massiah, both his evidence and the recorded
> conversation are somehow transformed into
> inadmissible evidence despite the fact that
> the hazard to Massiah remains precisely the
> same--the defection of a confederate in crime.

<u>Id.</u> at 211.

from the government in exchange for allowing the placement of the listening device in his car and engaging Massiah in conversation. Nor does the decision in <u>Massiah</u> condition the rule that it announced on a finding that the informant has received consideration or a benefit from the government.  The principal emphasis of <u>Massiah</u> is that the law enforcement officers deliberately had elicited information from Massiah without the knowledge, or the presence, of his counsel, and it was that conduct, not consideration or benefit received, which was the predicate for the finding that the Sixth Amendment had been violated.  In sum, considering the actual holding of <u>Massiah</u> in context of the facts of the case and the arguments addressed by the Court, it is rather clear that the Court did not make the presence or absence of consideration or benefit to the informer a factor in assessing whether Massiah's Sixth Amendment rights had been infringed.

The Supreme Court next addressed the "constitutional principle"[11] on which it had based the <u>Massiah</u> decision in <u>United States v. Henry</u>, 447 U.S. 264 (1980).  In <u>Henry</u>, federal law enforcement agents learned that one of their long-term paid

---

[11]  <u>Massiah</u>, 377 U.S. at 204-5 (articulating that the "constitutional principle" that emerged from <u>Spano v. New York</u> and that was the core of the decision in <u>Massiah</u> had its genesis in <u>Powell v. Alabama</u>, 287 U.S. 45 (1932) and had been reaffirmed in <u>Hamilton v. Alabama</u>, 368 U.S. 52 (1961); and <u>White v. Maryland</u>, 373 U.S. 59 (1963).

confidential informants had been incarcerated in jail with the defendant, Henry.  The federal law enforcement agent told the informant "to be alert to any statements made by the federal prisoners [including Henry], but not to initiate any conversation with or question Henry regarding the bank robbery."  Id. at 266.  While incarcerated with Henry, the informant engaged in conversation with Henry during which Henry told the informant about the robbery.  At trial, the informant testified about the statements made by Henry.  The Supreme Court held that those statements were the product of conversations between Henry and the informant who, at the time, was acting under instructions of the government.  Id. at 271.

The record in Henry disclosed that the informant had been a paid government informant for more than a year before his encounter with Henry and that the arrangement between him and the law enforcement agents of the United States was of a contingent-fee nature, pursuant to which the informant was paid only if he produced useful information.  Id.  Thus, unlike in Massiah, the informant in Henry had received consideration for acting on behalf of the government.

However, as in Massiah, the Supreme Court in Henry, did not impose a requirement that the rule of Massiah necessitated a showing that the informant had received a benefit or consideration from the government.  And, significantly, in examining Henry's

arguments, the Supreme Court identified the legal principle at issue as: "whether the Government has interfered with the right to counsel of the accused by 'deliberately eliciting' incriminating statements." Id. at 272.  In other words, the inquiry to be made in assessing a Massiah claim is whether there was interference by the government with the defendant's right to counsel in a particular way: e.g. by deliberating eliciting information from the represented defendant using a government informant.

In framing the answer to the critical question, the Supreme Court focused on several factors.  First, it identified the fact that Henry was unaware of the government's informant's role.  That is an important inquiry in the Sixth Amendment context because, as the Court explained, when a defendant is speaking with a known government agent, he is aware that the confrontation is adversarial and is to be conducted at arm's length.  However, "[w]hen the accused is in the company of a fellow inmate who is acting by pre-arrangement as a Government agent, the same cannot be said [because] [c]onversations stimulated in such circumstances may elicit information that an accused would not intentionally reveal to persons known to be Government agents." Id. at 273.

Second, the Court focused on the fact that Henry was incarcerated when he was engaged in conversation by the government informant.  That factor was thought to be relevant because there are "powerful psychological inducements to reach for aid when a

person is in confinement." <u>Id.</u> at 274 (citing <u>Miranda v. Arizona</u>, 384 U.S. 436, 448-54 (1966)).  Thus, the Court concluded that "the incriminating conversations between Henry and [the government's informant] were facilitated by [the government's informant's] conduct and apparent status as a person sharing a common plight." <u>Id.</u> at 274.

Therefore, although the Court, in <u>Henry</u>, made note of the fact that the government informant was paid, the presence of consideration was not emphasized as a factor in determining that the informant was acting on behalf of the government.  That is underscored when one considers that, in summing up its decision, the Court mentioned neither the fact of that agency nor the fact that the informant had been paid.  In particular, the Court explained that:

> <u>By intentionally creating a situation likely to induce Henry to make incriminating statements</u> without the assistance of counsel, the Government <u>violated</u> Henry's Sixth Amendment right to counsel.  This is not a case where, in Justice Cardozo's words, 'the constable blundered . . .' rather, it is one where the 'constable' planned an impermissible interference with the right to the assistance of counsel.

<u>Id.</u> at 274-275 (emphasis added) (internal citation omitted).  If, then, <u>Massiah</u> can be construed to have left doubt, <u>Henry</u> made clear that the controlling principle of <u>Massiah</u> was that the government was not free to violate an incarcerated defendant's Sixth Amendment right to counsel by creating situations likely to induce the

40

represented defendant to make uncounseled incriminating statements.

Five years later, in Maine v. Moulton, 474 U.S. 159 (1985), the Supreme Court again outlined the contours of the Sixth Amendment right that formed the basis of the decisions in Massiah and Henry. In Moulton, the defendant and a co-conspirator committed a number of serious property crimes. After Moulton was indicted and had retained counsel, the co-conspirator decided to cooperate with the United States. Moulton, 474 U.S. at 162-63. Thereafter, the co-conspirator, accompanied by his lawyer, met with two law enforcement officers. The co-conspirator fully confessed his participation in the crimes as to which he and Moulton had been indicted. Then, the law enforcement officers requested the co-conspirator to have a recording device placed on his telephone. The informant consented and three conversations were recorded. Not long thereafter, the police secured the co-conspirator's agreement to wear a body wire transmitter during a meeting wherein he and Moulton planned to discuss defense strategy.

The co-conspirator was told not to question Moulton but to engage in normal conversation. At their next meeting, the co-conspirator and Moulton began to discuss the offense, with the co-conspirator feigning absentmindedness and prompting Moulton to give a detailed incriminating statement that was admitted into evidence.

Against that factual background the Supreme Court framed the issue as follows:

> [W]hether respondent's Sixth Amendment right
> to the assistance of counsel was violated by
> the admission at trial of incriminating
> statements made by him to his co-defendant, a
> secret government informant, after indictment
> and at a meeting of the two to plan defense
> strategy for the upcoming trial.

Moulton, 474 U.S. at 161.  The Supreme Court began its analysis by

observing that:

> The right to the assistance of counsel
> guaranteed by the Sixth and Fourteenth
> Amendments is indispensable to the fair
> administration of our adversarial system of
> criminal justice.  Embodying 'a realistic
> recognition of the obvious truth that the
> average defendant does not have the
> professional legal skills to protect himself,'
> (citation omitted) the right to counsel
> safeguards the other rights deemed essential
> for the fair prosecution of a criminal
> proceeding.

Id. at 168-69.  Having explained the importance of the Sixth

Amendment right at issue, the Court held:

> Once the right to counsel has attached and has
> been asserted, the State must of course honor
> it.  This means more than simply that the
> State cannot prevent the accused from
> obtaining the assistance of counsel.  The
> Sixth Amendment also imposes on the State an
> affirmative obligation to respect and preserve
> the accused's choice to seek the assistance.
> We have on several occasions been called upon
> to clarify the scope of the State's obligation
> in this regard, and have made clear that, at
> the very least, the prosecutor and police have
> an affirmative obligation not to act in a
> manner that circumvents and thereby dilutes
> the protection afforded by the right to
> counsel.

42

Id. at 170-71 (emphasis added).  Thus, according to Moulton, the cardinal principle of the Sixth Amendment jurisprudence in Massiah and Henry is that the state has an affirmative obligation not to conduct itself in a way that circumvents the Sixth Amendment's guarantee of counsel.  And, in Moulton, the Court held that, as had been the case both in Henry and in Massiah, the state had breached that obligation by knowingly exploiting an opportunity "to confront the accused without counsel being present . . . ."  Moulton, 474 U.S. at 176.  Further, in Moulton, the Court once again underscored the "nature of the right recognized in Massiah and Henry."  In particular, the Court explained that:

> [T]he Sixth Amendment guarantees the accused, at least after the initiation of formal charges, the right to rely on counsel as a 'medium' between him and the State.  As noted above, this guarantee includes the State's affirmative obligation not to act in a manner that circumvents the protections accorded the accused by invoking this right.

Id. (emphasis added).

Having thusly defined the nature of the right at issue, the Court held that:

> [T]he Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a State agent.
>
> Applying this principle to the case at hand, it is clear that the State violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant.

43

*Id.*

The Court then outlined the factors which had led to that conclusion. First, the Court noted that the police had suggested that the informant record his conversations with Moulton. Then, having been informed by previously taped conversations between Moulton and the informant, the police asked the informant to wear a body wire transmitter so as to record what was said. On that record, the Court held that the police knew that Moulton would make statements "that he had a constitutional right not to make to their agent prior to consulting with his counsel." *Id.* at 177.

The decision in *Moulton* does not reflect that the Supreme Court considered compensation of, or benefit conferred upon, the co-conspirator/informant by the government to have been a factor of significance in ascertaining whether the government's conduct had violated the Sixth Amendment. Indeed, it runs counter to the whole tenor of that decision to suggest, as does the Commonwealth, that the government is free to sick its informant upon a represented defendant so long as it does not compensate the informant. Thus, although it is rather clear that, in *Moulton*, the Court regarded the co-conspirator/informant as a government agent, it also is clear that it was the arrangement between him and the government that produced that result, not the existence of consideration or benefit. And, the arrangement involved was simply an agreement by the informant to do what the law enforcement officials asked.

44

Thus, it is clear from the controlling Supreme Court decisions--<u>Massiah</u>, <u>Henry</u> and <u>Moulton</u>--that consideration or benefit to the informant is not the <u>sine qua non</u> of the informant's status as an agent of the State. Rather, agency is created by the agreement to act on behalf of the state and pursuant to its instructions. <u>See</u> <u>Randolph v. People of State of Cal.</u>, 380 F.3d 1133, 1144 (9th Cir. 2004)(noting that, "it is the relationship between the informant and the State, not the compensation the informant receives, that is the central and determinative issue").

This, of course, is consistent with long-standing, general principles of agency law. And, as is made clear by the Restatement of Agency, it is black letter law that compensation is not required to establish agency. Restatement (Second) of Agency, § 16 (1958), ("[t]he relation of principal and agent can be created although neither party receives consideration.") Likewise, it is well-established that "[t]he relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act." Restatement (Second) of Agency, § 1, comment a (1958). Put another way:

> Agency is a legal concept which depends upon
> the existence of required factual elements:
> the manifestation by the principal that the
> agent shall act for him, the agent's
> acceptance of the undertaking, and the
> understanding of the parties that the
> principal is to be in control of the
> undertaking. The relation which the law calls

45

agency does not depend upon the intent of the parties to create it, nor their belief that they have done so.   To constitute the relation, there must be an agreement, but not necessarily a contract, between the parties; if the agreement results in the factual relation between them to which are attached the legal consequences of agency, an agency exists although the parties did not call it agency and did not intend the legal consequences of the relation to follow.

Restatement (Second) of Agency, § 1, comment b (1958).

It has been said that, in assessing a <u>Massiah</u> claim, "common law agency rules are merely an available and not a controlling touchstone." <u>United States v. LaBare</u>, 191 F.3d 60, 65 (1st Cir. 1999).   However, no authority is cited for that assertion. Moreover, wholly apart from the absence of authority, the fundamental principles of agency cited above are so well-settled that it is unsurprising that the Supreme Court decisions contain no dissertation on the agency points.   Indeed, in <u>Massiah</u>, <u>Henry</u> and <u>Moulton</u>, the informant agreed to act for the government and pursuant to its instructions when deliberately eliciting the incriminating statements that were held to violate the Sixth Amendment.   And, that was sufficient for the Supreme Court to attribute the elicitation to the government.

The Commonwealth relies on some circuit court decisions which it argues show that consideration or benefit to the informant is essential to a finding that the informant was acting for the government when eliciting statements from an incarcerated,

represented defendant.  Of course, under the provisions of Section 2254(d)(1), only the decisions of the Supreme Court provide the measure of clearly established law.  Nonetheless, it is useful to review the circuit court decisions.

The Seventh Circuit has held that consideration is a necessary predicate for finding the informant to be a government agent. First, in United States v. York, 933 F.2d 1343 (7th Cir. 1991), overruled on different grounds Wilson v. Williams 182 F.3d 562 (7th Cir. 1999), the Seventh Circuit pointed out that in Henry and Kuhlmann v. Wilson, 477 U.S. 463 (1986), the Supreme Court had addressed circumstances in which government informants had been placed with prisoners in confinement.  According to the Seventh Circuit, "Henry and Kulmann focused more directly on whether the challenged statements had been deliberately elicited rather than the question of whether the informants were acting as Government agents when the statements were made.  In both cases, the Court concluded without discussion that the informants were agents." Id. at 1356.  Unfortunately, York does not mention Moulton, which was decided five years earlier.   To make matters worse, York makes the following statement respecting agency and consideration:

> It is merely a tautology to argue that the Government should not be in the business of providing a market for information that infringes sixth amendment rights; there is no infringement unless the informant was a Government agent, and there is no agency absent the Government's agreement to reward the informant for his services.

47

York, 933 F.2d at 1357.  Regrettably, there is no citation offered
in support of that statement.  For that reason and because nothing
in Massiah, Henry or Moulton requires that an informant must be
compensated before being considered a government agent, and because
the statement in York is at odds with basic and settled rules of
agency law, York, even if it could be considered under Section
2254(d)(1), is not persuasive authority.

The Commonwealth also cites United States v. Love, 134 F.3d
595 (4th Cir. 1998) as support for the approach taken by the
Supreme Court of Virginia.  According to the Commonwealth, Love
requires a finding of consideration or benefit running to the
informant before the informant can be considered a government agent
within the meaning of Massiah, Henry and Moulton.  To the contrary,
an examination of the decision in Love discloses that the decision
does not support that assertion.

In Love, the Fourth Circuit, citing Moulton, held that:

> The role of the Government in the deliberate
> elicitation of such statements is a crucial
> importance for, 'the Sixth Amendment is not
> violated whenever--by luck or happenstance--
> the State obtains incriminating statements
> from the accused after the right of counsel
> has been attached.'

134 F.3d at 604.  Having defined the issue as it was defined in
Massiah, Henry, Moulton and Kuhlmann, the Fourth Circuit then went
on to explain why the informant in Love was not acting on behalf of
the government.  In so doing, the Court of Appeals pointed to a

number of record facts which refuted the defendant's argument that the informant was so acting.  Among the many factors cited was that the informant had not been paid for providing information.  Then, the court reached the unremarkable conclusion that, in the absence of all the indicia that had ever been considered to find that an informant was acting for the government, the defendant's <u>Massiah</u> claim lacked merit.  That is certainly not a holding that compensation is a prerequisite to a finding that an informant is acting on behalf of the government.

In <u>Creel v. Johnson</u>, 162 F.3d 385 (5th Cir. 1998), the Fifth Circuit, in a rather confusing decision, approved a district court's formulation of a test that required the defendant asserting a <u>Massiah</u> claim to show that the informant was "promised, reasonably led to believe, or actually received a benefit in exchange for soliciting information from the defendant."  <u>Id.</u> at 393.  It is unclear why the Fifth Circuit approved that formulation of an approach to a <u>Massiah</u> claim.  Nonetheless, because nothing in <u>Massiah</u>, <u>Henry</u> or <u>Moulton</u> supports that view, it will not be accepted here.

The Commonwealth next relies on <u>Thomas v. Cox</u>, 708 F.2d 132 (4th Cir. 1983) to support its assertion that agency cannot exist absent a <u>quid</u> <u>pro</u> <u>quo</u> arrangement.  Certainly, the absence of consideration figured prominently in the court's determination that the encounter between witness and informant lacked "the requisite

degree of 'prearrangement' or 'cooperation' between state and witness required to implicate the state and thereby invoke the protections of the Sixth Amendment." Id. at 137.  But, this just shows that compensation can be a relevant factor in determining whether a citizen's action should be attributed to state.  Id. However, neither Cox, nor the relevant precedent, suggest that where there is substantial prearrangement and cooperation between the state and an informant, the Sixth Amendment is not implicated merely because the informant is not compensated.

The Commonwealth also contends that Thomas v. Cox establishes that the law respecting the contours of the agency issue are not clearly established.  In support thereof, the Commonwealth points to the following statement made by the Court of Appeals in Thomas:

> The point at which agency--hence proper attribution--for this purpose arises out of a Government-citizen relationship is not subject to any bright-line test.

Id. at 136.  That argument fails, however, because whether the issue is "subject to a bright-line test" is a far different matter than whether the test, bright-line or otherwise, is clearly established.  And, as explained above, the Massiah test is clearly established by Supreme Court precedent, and has been for many years.

Finally, the Commonwealth relies on Matteo v. Superintendent, SCI Albion, 171 F.3d 877 (3d Cir. 1999) wherein the Third Circuit held that a "quid pro quo"--in which the informant receives some

type of benefit, even if nonpecuniary, in exchange for assisting the authority--may constitute evidence of an agency relationship," id. at 894, and also expressed the view that "[t]he Supreme Court has not formally defined the term 'Government agent' for Sixth Amendment purposes." Id. at 893. This, says the Commonwealth, shows that the Massiah rule is not clearly established. The Third Circuit's comment is grounded largely on the view that Henry was the "sole case focusing on a determination of Government agency" and that, in Henry, the informant was found to be an agent because "he was paid and 'acting under instructions' of the Government." Id. (citing Henry, 447 U.S. at 270). As explained above, Henry did not, however, make payment a deciding factor in the Sixth Amendment analysis. And, for the reasons set forth above, it is apparent that the decisions of the Supreme Court that control here--Massiah, Henry and Moulton--simply do not require any consideration or benefit to the informant in order to find that the informant was acting on behalf of the government. It is a disservice to the assessment of what is clearly established to ignore the context of the controlling decisions (Massiah, Henry and Moulton) and then write them off as leaving uncertain how it is that the district courts should measure whether a Sixth Amendment right, as defined by those cases, is infringed. That disservice will not be perpetuated here.

In any event, the decisions that control the issue are those of the Supreme Court in <u>Massiah</u>, <u>Henry</u> and <u>Moulton</u>. Those rules were clearly established when the Supreme Court of Virginia issued its decision in this case. And, while <u>Massiah</u>, <u>Henry</u>, and <u>Moulton</u> allow the consideration of a variety of factors, including the conferring of consideration and benefit, they do not make the <u>Massiah</u> claim stand or fall on the presence, or the absence, of consideration or benefit to the informant.

### c.   Was Sauer an Agent of the State When he Taped His Conversation With Schmitt?

As reflected above, "the primary concern of the <u>Massiah</u> line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police investigation." <u>Kuhlman v. Wilson</u>, 477 U.S. 436, 459 (1986). The "on behalf of the government" inquiry seeks to ascertain whether it is appropriate to attribute to the state the private citizen's conduct as the surreptitious interrogator. See <u>Thomas v. Cox</u>, 708 F.2d 132, 136-37 (4th Cir. 1983)(citing <u>Henry</u>, 447 U.S. at 270); <u>United States v. Surridge</u>, 687 F.2d 250, 252 (8th Cir. 1982). <u>Massiah</u>, <u>Henry</u> and <u>Moulton</u> clearly teach that, where the state instructs an interlocutor to obtain information from a particular defendant, the interlocutor acts on behalf of the state. See <u>Moulton</u>, 474 U.S. at 176-77; <u>Henry</u>, 447 U.S. at 271 n. 8, 272 n.10. In this regard, "knowing exploitation of the State of an opportunity to confront the accused without counsel being present is as much a breach of

the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." Moulton, 474 U.S. at 176.

Sauer acted as agent of the Commonwealth because, as was the case with the informant in Moulton, Henry, and Massiah, the state recruited Sauer to obtain information from a particular defendant. See Moulton, 474 U.S. at 176 ("it is clear that the state violated Moulton's Sixth Amendment right when it arranged to record conversations between Moulton and its undercover informant"); Henry, 447 U.S. at 270-73. Furthermore, as was true in Moulton, Henry, and Massiah, Sauer's relationship with George was trimmed out with other indicia reflecting Sauer's bond to the state. Specifically, George had freighted his instructions to Sauer with cues as to what information the police desired and sealed their arrangement by delivering a tape recorder that Sauer was to use in his efforts to secure information from Schmitt. Moulton, 474 U.S. at 176-79; Henry, 447 U.S. at 266. The presence of the device served to remind Sauer, as it did the informant in Massiah and Moulton, that the state was artificially present and expecting him to obtain incriminatory information from the defendant. Sauer eagerly fulfilled those expectations. Henry and Moulton clearly teach that the fortuitous presence of an eager informant does not diminish, in the first instance, the state's affirmative obligation not to recruit him to obtain information from a particular

53

defendant.  <u>Moulton</u>, 474 U.S. at 176.  In light of the foregoing facts and law, Sauer was clearly acting on behalf of the state when he taped evidence that was used by the Commonwealth to secure a death sentence for Schmitt.  And, given the clearly established law articulated by the Supreme Court of the United States, it was unreasonable for the Supreme Court of Virginia to have concluded otherwise.

### 3. Counsels' Failure To Pursue A Pretrial Motion To Suppress The Sauer Tape

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court held that, to demonstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense.  <u>Id.</u> at 687.

To satisfy the deficient performance facet of <u>Strickland</u>, the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 687-88. And, to avoid the distorting effects of hindsight, a court on federal habeas review is required to evaluate "the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  <u>Id.</u> at 690. "The Court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent performance."  <u>Id</u>.   The

54

Supreme Court further has admonished that, "[t]o counteract the natural tendency to fault an unsuccessful defense, a court reviewing an ineffective assistance counsel claim must 'indulge a strong presumption that counsel's conduct falls within the wide range reasonable professional assistance.'" Nix v. Whiteside, 475 U.S. 157, 165 (1986)(quoting Strickland, 466 U.S. at 689).  Guided by the foregoing principles, the Court will examine, Schmitt's charge that counsel were deficient for declining to file a pretrial motion to suppress the Sauer tape.

Counsel were faced with a daunting task in defending Schmitt. In light of the physical and testimonial evidence available to the Commonwealth, there was virtually no doubt that Schmitt would be convicted of murder and robbery.  The critical consideration for counsel, and, of course, for Schmitt, was how to avoid a conviction for capital murder and exposure to a death sentence.  After evaluating the available evidence, counsel reasonably perceived that Schmitt's best chance to avoid a capital murder conviction was to show that the fatal shooting was accidental rather than cold-blooded, premeditated murder.  A defense of that sort found support in the forensic evidence and Schmitt's statements to Lieutenant Clarcq, the hostage negotiator.  However, Schmitt's tape recorded description of the shooting to Sauer provided the clearest and most direct evidence of that defense.  Counsel recognized, however, that, in light of Virginia law, it was unlikely that the

55

defense could introduce Schmitt's self-serving statements to Sauer and Clarcq during the guilt phase of the trial.

In determining how to proceed, counsel considered that: (1) if they failed to move before trial to suppress the tape, Schmitt would be precluded from challenging its introduction at the sentencing phase; (2) should Schmitt be found guilty of capital murder, the tape would be more harmful than beneficial at sentencing; and (3) although it was unlikely under Virginia law that the defense could secure admission of the tape during the guilt phase, there was a realistic possibility that the tape would be introduced during that phase by Commonwealth. Counsel concluded that Schmitt's transcendent need for the tape during the guilt phase warranted foregoing a pretrial motion to suppress the tape at the sentencing phase. That decision, says Schmitt now, was unreasonable and flowed from a lack of investigation or research.

At the outset, it is appropriate to put to rest Schmitt's suggestion that ignorance of facts or law contributed to defense counsels' failure to file a pretrial motion to suppress. Before trial, counsel were well aware that there was available an argument that admission of the Schmitt/Sauer tape would violate Schmitt's Sixth Amendment rights (e.g., they knew that there was a possible Massiah claim). Counsel further recognized that Virginia law would bar them from challenging the tape on those grounds unless they raised the issue in a pretrial motion to suppress. Thus, the

record shows that the conduct of which Schmitt now complains was not the product of ignorance of the facts or failure to know the law.

Nor is there merit to Schmitt's assertion that counsels' decision to forego a motion to suppress was the product of an uninformed assessment of the impact of the Schmitt/Sauer conversation at sentencing. Counsel had read the transcript and recognized that, if the tape were to be admitted only at sentencing, the potential harm outweighed its potential benefit to the defense. Although counsel may have failed to fully predict how, in rebuttal, the prosecutor would employ the taped conversation to puncture the defense case, that speaks more to the oratorical skills of the prosecutor than the deficiency of defense counsel.

Moreover, Schmitt fails to acknowledge the continuing utility of the tape during the sentencing phase for meeting the Commonwealth's case that he deserved to be sentenced to death. For example, the defense used Schmitt's taped recounting of the purported struggle with Mr. Dunning in tandem with Schmitt's statements to Clarcq to defeat the Commonwealth's charge Schmitt's conduct satisfied the vileness aggravator. Additionally, Schmitt's taped assertions of his desire to protect his family and friends was one of the few scraps of mitigation evidence available to the defense. All of this is not to say that, at sentencing, the tape was as a whole favorable to Schmitt or that counsel perceived it as

such.   Rather, it illustrates that before declining to file a
pretrial motion to suppress, counsel made a deliberate assessment
of the stakes involved in pursuing the course they knowingly
elected to pursue.

Schmitt contends that counsel took an unnecessary risk by
deciding not to file a pretrial motion to suppress the tape.
Schmitt contends that counsel could have, and should have,
litigated in a pretrial motion in limine whether Schmitt's
statements to Clarcq and Sauer would be admitted in the guilt phase
as an exception to the hearsay rule and then should have filed an
alternative pretrial motion to suppress the introduction of the
evidence at the sentencing phase.[12]   Counsel apprehended that the
filing of such motions would alert the Commonwealth that Schmitt
desired to use the tape during the guilt phase.   That was a risk
that counsel decided not to take because, in their view, it would
dissuade the Commonwealth from introducing the tape during the
guilt phase, and that, in turn, would eliminate the only real
chance of having the tape admitted in evidence at the guilt phase
of the trial.

---

[12] As discussed previously, Virginia law did not permit the
defense to introduce Schmitt's statements to Clarcq and Sauer
during the guilt phase.   Thus, counsel cannot be faulted for
failing to pursue a motion in liminie which even Schmitt
acknowledges stood little chance of succeeding.

That tactical decision is what now must be assessed against a standard of reasonableness.  To begin, the record discloses that counsel had good reason to believe that the Commonwealth might well introduce the tape during the guilt phase.  In this regard, the lack of remorse shown on the tape and Schmitt's assertion that he was "committed" to robbing the bank were attractive evidence to a prosecution attempting to prove premeditation.  Furthermore, counsel reasonably perceived that the introduction of the tape by the Commonwealth would be a significant boon to a defense that had precious little evidence to meet the compelling case that Schmitt was guilty of capital murder.  The introduction of the tape by the Commonwealth would place before the jury, in his own words, Schmitt's account that the shooting was accidental.  This direct evidence of the shooting would provide a ready-made structure upon which the defense could then hang its supporting forensic evidence. And, given the state of Virginia law, counsel were reasonable in concluding that the best chance of having the evidence available in the guilt phase of the trial was for the prosecution to introduce the tape into evidence.

We now know that, despite the absence of any pretrial motion to suppress the Sauer tape, the prosecution decided not to introduce the tape during the guilt phase.  Contrary to Schmitt's suggestion, that outcome is not the appropriate measure of counsels' performance.  Strickland, 466 U.S. at 689. "It is all too

tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission was unreasonable." Id.

To avoid that temptation, it is necessary to assess the realistic circumstances facing counsel before trial. Here, counsel were faced with the onerous task a defending a client who, notwithstanding a relatively normal upbringing, had become a drug dealer, a robber, and who likely would be adjudged a murderer. From all accounts but his own, Schmitt's murder of Mr. Dunning, a much beloved-member of the community, was nothing short of a cold-blooded execution.  Counsels' best hope for admitting the most direct and clear evidence of Schmitt's only defense to the capital murder charge rested in the prosecution's introduction of the Sauer tape in the guilt phase of the trial.  Measured from that perspective and considering the reasonably perceived costs and the significant potential benefits, the decision made by counsel was not "outside the wide range of professionally competent performance" to forego a pretrial motion to suppress the tape at issue.  Strickland 466 U.S. at 490; see Bell v. Cone, 535 U.S. 685, 700-2 (2002).  Accordingly, Claim XIV will be dismissed. Additionally, because Schmitt has failed to demonstrate cause to excuse the default, Claim XX will be dismissed.

IV.   **PROPOSED CLAIM XXIV: THE PROSECUTOR'S PURPORTED SUPPRESSION OF IMPEACHMENT EVIDENCE PERTAINING TO CLIFFORD SAUER**

Under Fed. R. Civ. P. 15(a), leave to amend shall be freely given absent bad faith, undue prejudice to the opposing party, or futility.   See Foman v. Davis, 371 U.S. 178, 182 (1962).   The parties have fully briefed the issue whether the proposed amendment raises a genuine issue of material fact and have presented all relevant evidence in support of their positions. Because, as discussed below, the Warden would be entitled to judgment as a matter of law with respect to proposed Claim XXIV, the motion to amend will be denied as futile.   See Milanese v. Rust-Oleum Corp., 244 F.3d 104, 110 (2d Cir. 2001).

Schmitt alleges that the Commonwealth violated its obligation under Brady v. Maryland, 373 U.S. 83 (1963), when it failed to disclose the impeachment evidence that: (1) Sauer had been working with the police before Schmitt was captured; (2) Sauer had been granted immunity before the multi-district grand jury; and (3) Sauer was mentally unstable and had received a free mental health evaluation.   The Warden's initial response is that the proposed Claim XXIV is defaulted and lacks merit.

The Warden contends that Claim XXIV is defaulted because Schmitt could have obtained the information from Sauer during the state habeas proceeding.   The Warden's terse assertion of that point does not explain why, in light of the prosecutor's silence,

Schmitt should have suspected and pursued a <u>Brady</u> claim with regard to Sauer's mental health and the prosecution's grant of immunity. <u>See</u> <u>Strickler v. Greene</u>, 527 U.S. 263, 281-83 (1999).  However, it is unnecessary to parse the Warden's inchoate procedural default defense because it is apparent that the <u>Brady</u> claim lacks merit. <u>See</u> <u>Yeatts v. Angelone</u>, 166 F.3d 255, 261 (4th Cir. 1999).

The three components of a meritorious <u>Brady</u> claim are that: (1) the evidence at issue must be favorable to the defendant, whether directly exculpatory or of impeachment value; (2) the evidence at issue must have been suppressed by the government, whether willfully or inadvertently; and (3) the evidence must be material.  <u>See</u> <u>Spicer v. Roxbury Correctional Institute</u>, 194 F.3d 547, 555 (4th Cir. 1999).  The materiality standard for a <u>Brady</u> claim is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." <u>Kyles v. Whitley</u>, 514 U.S. 419, 435 (1995).  Here, the materiality issue focuses on the sentencing phase because that is the part of the trial in which Sauer testified.

## A.  Was the Evidence at Issue Exculpatory or of Impeachment Value?

The evidence at the heart of the <u>Brady</u> claim is not exculpatory.  It is, however, of impeachment value.  The facts that Sauer was a government informant, that he had been granted

immunity, and that he was mentally unstable (and sufficiently so, in the prosecution's view, that the prosecution made available to him mental help that he would not have gotten absent prosecution influences), all would have helped the jury assess Sauer's credibility. And, the evidence pointed to alignment with the prosecution. Clearly, those facts are of impeachment value.

**B.   Whether the Prosecutor Suppressed the Evidence at Issue**

Except for the fact that Sauer was acting on behalf of the government in taping the conversations with Schmitt, the evidence at issue was discovered by Schmitt only after the trial and, indeed, largely, in this case. Von Schuch admittedly did not make known to the defendant that Sauer had received a grant of immunity or had been offered mental health counseling. Given the cavalier attitude about the prosecutor's Brady obligations that Von Schuch displayed in his testimony at the evidentiary hearing, there is strong reason to believe that the suppression of that evidence was intentional. But, whether intentional or inadvertent, the impeachment evidence was suppressed.

**C.   Was the Suppressed Evidence Material?**

Considering the record as a whole, the impeachment evidence would not, if used, have "put the whole case in such a different light as to undermine the confidence in the verdict." Kyles, 514

U.S. at 435.   Thus, it does not meet the <u>Brady</u> standard for materiality.

First, the new impeachment evidence likely would not have prevented the Commonwealth from introducing the Schmitt/Sauer tape and Sauer's principal function as a witness was to provide authentication and foundation for the tape.   Nor would the new evidence have altered the jury's evaluation of the demeanor that Schmitt displayed during the conversation with Sauer.

At most, the evidence at issue would have caused the jury to have doubted other aspects of Sauer's testimony.   However, the other evidence offered by Sauer, in his ten pages of testimony, was either addressed to undisputed facts or to facts that did not play a vital role in the prosecution's death sentence argument.   For instance, Sauer testified to Schmitt's drug use, to Schmitt's involvement in the January 19 bank robbery, and to Schmitt's use of a false name to avoid prolonged incarceration.   Those facts also were presented by other witnesses for the Commonwealth, and there was no evidence to the contrary.

The only pertinent uncorroborated matters to which Sauer testified were Schmitt's request to purchase Sauer's gun and Schmitt's threat to kill Joanna Murphy because he thought she might talk to police.   However, Schmitt did not purchase the gun, nor in the three weeks between this threat and his arrest did Schmitt

attempt to kill Joanna Murphy.  As a result, neither of these facts figured prominently in the prosecution's case at sentencing.

Instead, the prosecution emphasized that a death sentence was warranted because of the ruthless nature of the murder of Mr. Dunning, Schmitt's criminal record, and the lack of remorse shown on the tape.  In passing on the sufficiency of the evidence for the future dangerousness aggravator, the Supreme Court of Virginia recited the following evidence that supported those arguments:

> Here, Schmitt murdered Dunning, an innocent security guard, to facilitate a robbery and to avoid being apprehended at the robbery scene. The jury was entitled to find that this violent, premeditated action was strong evidence that Schmitt is a dangerous person who would commit future criminal acts of violence.
>
> The jury also was entitled to consider Schmitt's criminal record. As we have stated, this record includes two convictions of possession of marijuana with the intent to distribute, possession of a firearm by a convicted felon, and receiving stolen property. After being released from confinement in 1997, Schmitt was placed on probation. Based on his failure to comply with drug testing requirements and to report to his probation officer, Schmitt was charged with violating his probation and failed to appear in court to answer those charges. Further, during the time leading up to the present offenses, Schmitt had been "working" as a drug dealer.
>
> Significantly, the jury also was allowed to consider the fact that Schmitt had committed another armed robbery less than one month prior to the present offense. This evidence, in addition to evidence of the present crimes, demonstrated that Schmitt did

65

> not refrain from violent criminal behavior,
> even after having experienced incarceration
> and having received the benefit of probation
> supervision.

Schmitt v. Commonwealth, 547 S.E.2d 186, 201-2 (Va. 2001) (internal citations omitted).

Additionally, the circumstances of the February 1999 robbery provided compelling evidence of Schmitt's lethal criminal propensities.  The video tape of that robbery depicts a man who was at ease in the use of murder as a means to accomplish his objectives.  Within seconds of killing Mr. Dunning, Schmitt told the frightened bank employees, who were loading money in a bag, "I'm going to shoot somebody else if you don't hurry up."  JA at 829.  Schmitt then began to count back from ten to zero as the tellers attempted to fill his trash bag with cash.

In sum, the prosecution's case at sentencing would look almost the same even if one discounts the testimony offered by Sauer on matters as to which he could have been impeached by the evidence that Von Schuch withheld.  Having considered the record as a whole, the Court cannot find a reasonable probability that the verdict would have been different if the withheld impeachment evidence had been available to Schmitt.  In other words, the "favorable evidence could [not] reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict [here, the sentence of death]."  Kyles, 514 U.S. at 435.  For that reason,

the proffered amendment of the petition to add Claim XXIV would be futile.  Hence, the motion for leave to file the amendment will be denied.

Although a proper respect for the jurisprudence that controls federal habeas corpus review necessitates this result, the Court would be remiss not to express on the record the great concern created by the prosecutor's conduct here.  Specifically, the prosecutor suppressed information of obvious impeachment value. That indicates a disregard of the proper prosecutorial role, as circumscribed by Brady, or the federal constitution as outlined clearly by Brady and its progeny, or both.  Moreover, when the prosecutor testified at the evidentiary hearing, his demonstrated attitude toward the dictates of Brady were evident.  Indeed, he seemed to regard the whole concept of Brady as a game.

In this instance, the prosecutor's suppression of impeachment evidence turned out not to be material.  But, that was fortuitous. And, it is not the office of the prosecutor to gamble with the materiality factor when he becomes aware of impeachment evidence. On this occasion, the consequence of the prosecutor's conduct was protraction of this litigation, the expenditure of funds for counsel to explore the issue, and the consumption of limited judicial resources to resolve the issues needlessly created by the conduct at issue.  Those consequences were utterly unnecessary.

One would hope that this prosecutor, and all others, would learn from experiences such as this one.  But, the most effective assurance that <u>Brady</u> will be fulfilled in state prosecutions lies in the full enforcement of its command by the state courts which have the power to order compliance with <u>Brady</u> and to discipline those who do not take its commands seriously.

## V.  CONCLUSION

For the foregoing reasons, Claims XIV and XX will be dismissed, and the motion for leave to amend the petition to add proffered Claim XXIV will be denied.

The Clerk is directed to send a copy of the Memorandum Opinion to counsel of record.

It is so ORDERED.


                                /s/

                                Robert E. Payne
                                United States District Judge

Richmond, Virginia
Date:    09/14/05